## THE UNITED STATES, APPELLANTS v. CHARLES F. SIBBALD, APPELLEE.

A petition was presented to the governor of Florida, before the cession of the territory to the United States, setting forth that the petitioner was desirous of erecting machinery for sawing timber, &c., and asking " permission for that purpose, with the corresponding survey of the grant of land of five miles square, sixteen thousand acres, or its equivalent, in the event that this situation will not permit the said form; which land will insure the continued supply of timber. The permission was granted, without injury to third persons, under the express condition that until the establishment of the mill, the grant of the land, which will be a square of five miles, in order that he may use the timber, shall be of no effect." A survey was made of ten thousand acres, but no more than that quantity could be had at the place described; and the residue of the grant, six thousand acres, was afterwards surveyed in other places, at distances of twenty and thirty miles. In 1819, the grantee commenced the erection of a mill, which was afterwards carried away by floods. In 1827, another mill was commenced, which was destroyed by fire in July 1828; and in October 1828 another mill was commenced, which went into operation in 1829. The superior court of East Florida confirmed the survey of ten thousand acres, and rejected the two surveys amounting to six thousand acres. Held: that the grantee was entitled to the whole sixteen thousand acres.

By the eighth article of the treaty of cession of Spain to the United States, the same time is allowed to the owners of land granted under the authority of Spain, to fulfil the conditions of their grants, after the date of the treaty, as was limited in the grants. It has been decided by this court, in the case of Arredondo, that as to individual rights, the treaty is to be considered as dated at its ratification.

It has been decided, in Arredondo's case, that that provision of the treaty as to the performance of the conditions in grants, is not confined to owners of land by occupancy or residence; but extends to persons who have a legal seisin and possession of land, in virtue of a grant; and that, in the situation of the province, and the claimants to land at the time of the cession, it was enough that they should show a performance of the condition *cy pres.*

APPEAL from the superior court of East Florida.

This was a claim to land in East Florida, presented to the superior court of East Florida, by the appellee, founded on a concession for sixteen thousand acres of land, made by Don José Coppinger, governor of the province of East Florida, to Charles F. Sibbald, the claimant, on the 2d day of August 1816; for five miles square, or sixteen thousand acres of land.

On the 16th day of July 1816, the petitioner, Charles F. Sibbald, presented his petition to governor Coppinger, supplicating his permission to construct a water saw-mill on the creek called Six Miles,

alias Little Trout creek, on the north side of the river St John's and that of Nassau, the creeks of which empty their waters into the said St John's river; with the corresponding surety for the grant of lands embraced in a line of two and a half miles to each wind, making a square of five miles, or its equivalent, in the event that this situation will not permit the same form; which land, he says, will insure the continued supply of timber.

On the 2d of August of the same year, the governor made his decree, granting the permission solicited; under the express condition that, until the establishment of the mill, the grant of the land, which will be of two miles and a half to each wind, making a square of five miles, in order that he may use the timber, &c., shall be of no effect.

Ten thousand acres of this land were surveyed upon Little Trout creek, agreeably to the calls of the grant. Four thousand acres were surveyed by George J. F. Clarke, public surveyor, on the 8th day of February 1820, in Turnbull's swamp, at Mosquito, more than one hundred miles to the southward from the first location, and between which and it there is no water communication except by the open sea; and the remaining two thousand acres were, on the 20th of February 1820, surveyed by said Clarke, at Bow Legs hammock, about the same distance to the west, and from the first survey, between which and those two thousand acres, there is no water communication at all.

The petitioner alleges, that in compliance with the condition of said grant, he, in the year 1819, expended six or eight thousand dollars in the erection of a water saw-mill, which was nearly completed; but that, owing to various difficulties, and the embarrassments of said province, the mill did not go into operation.

That, since the cession of the Floridas to the United States, he has expended upwards of twenty thousand dollars in the erection of a steam saw-mill on the tract of ten thousand acres, which was completed, and some time in full operation; but that in the month of July 1828, it was entirely destroyed by fire, and that he has since commenced another, upon a much more extensive scale. This last has been completed since the filing of the petition in this case.

The answer of the district attorney denies the power of the governor to make this grant; and puts the claimant to the proof of all the allegations contained in his petition, and insists that he has not complied with the condition of the concession.

[United States v: Sibbald.]

That by a decree of governor Coppinger, bearing date the 29th of October of the same year (White's Compilations), the term of six months was limited for the performance cf the conditions of all grants of this nature ; and that it was then especially decreed by said governor, that all those grants, the conditions of which were not performed at the expiration of said six months, should be null and void, and that the lands should be annexed to the class of public land ; which decree was subsequently, to wit on the 18th day of January 1819, by another decree of the same governor, fully affirmed : and that the said Charles F. Sibbald did not erect the said saw-mill within the said term of six months, and that consequently said concession, at the expiration thereof, became null and void, and the lands were annexed to the class of public lands.

The original concession in this case was not to be found in the archives ; but a copy certified by Thomas de Aguilar, late secretary of the government of the province, was produced and proved.

The proof in relation to the building of the mills, is substantially as stated in the petition, and a duly certified copy of the survey was also produced.

Points submitted on the part of the United States in the court below :

1. As to the power of the governor to make the grant.

This question is considered by the court below, as settled by the several decisions of the court.

2. As to the validity of the surveys of four thousand and two thousand acres.

This was also considered as settled against the claimant by the decision of this court ; and the claimant has appealed as to this part of the decree.

3. Did Sibbald, the grantee, perform the condition of this concession, either literally or substantially ?

The superior court decided in favour of the petitioner, for ten thousand acres ; and against the claim of the petitioner to the six thousand acres.

Both parties appealed to this court.

Mr White, for appellee.

This is what is called a mill grant ; a grant of a prescribed quantity of land, on the express condition of establishing a water saw-

mill on the river St John, and Cone's, or watercourse, called Six Mile or Trout creek. No specific time is limited in the decree within which the mill was to be erected and put in operation. The governor contented himself with declaring that, until the memorialist should "settle (establish) the said mill, this grant shall be of no effect."

The evidence in the record is ample to show that this condition was fully complied with. The first mill was built in 1819, and carried away by a freshet. The second was built in 1827, and was in operation until 1828, when it was destroyed by fire, in July 1828. The third, and last, was built and went into operation in 1829.

United States v. Richard, 8 Peters 470. This is a case of a similar grant made by the same governor, which was confirmed by the supreme court, of a later date than this. In that case, as in this, the condition was not complied with until after the 24th of January 1818. That case also decides that these grants conveyed the lands, and not the timber merely. The grant to the claimant was made on the 2d of August 1816; and the certificate of the secretary bears date on the succeeding day.

The memorial asks for an order of survey, "together with suitable warrants to survey the ground;" and this is granted by the decree, "concedo su permisso." Under this authority, the surveyor-general surveyed the prescribed quantity of lands in detached parcels, on the 2d of May 1819, and on the 8th and 20th of February 1820.

In Richard's case, above referred to, the surveys were made in detached parcels, and at a later period than this. United States v. Clarke, 8 Peters 436. This, and the other cases decided at the same term, all affirm the authority of the governors of East Florida to make these grants.

Where the grants had issued before the 24th of January 1818, they recognise the authority of the governors to make orders of survey for the lands granted; and of the surveyor-general to execute them after that date. But the court, in that case, rejected a claim to land, taken up under an order of survey, changing, as to a part of the land, the location specified in the original grant, which order was made on the 25th of January 1819; considering it as equivalent to a new grant: and the supposed analogy between that case and the one now under consideration presents the only question which can arise here.

[United States v. Sibbald.]

A brief examination of that case, in its application to the one at bar, will show the want of analogy between them.

On the 3d of April 1816, George F. Clarke obtained a grant of five miles square, with a specific location, " on the west side of St John's river, above Black creek, at a place called White Spring." It was an absolute title for so much land at a specified place, with the usual proviso, " without prejudice to others." But Mr Clarke was not satisfied with the land granted to him. Although there was sufficient vacant or public land at the specified place to make up the quantity granted, yet it " did not answer his expectation ;" and stating this fact in his petition to the governor, on the 25th of January 1819, he asked that the surveyor might be authorized to survey the one half of the quantity specified in the first grant at another place, viz. "on the Hammock, called Lang's and Cone's, on Mizzel's lake." And the governor so ordered it. This raised the question in that case.

The court held that this change of location could not be authorized by the governor after the 24th of January 1818 ; that the grant to Clarke conveyed the land described in it, and no other ; and that a permit to survey other lands was, in effect, a new order of survey, which the governor had not power to make on the 25th of January 1819. The principle is not questioned ; but that is not the case of the present claimant.

. The memorialist, Charles Sibbald, applied for a situation on which to erect his mill, which he specified, and for a grant of land of five miles square, "together with suitable warrants for the survey of ground, which occupies two and a half miles on every side, making a square of five miles, or an equivalent quantity, in case this situation may not allow of the said figure." And " the same is granted" by the governor—Concedo su permisso.

The reference in the decree to the memorial makes the latter instrument part of the decree itself. Then it is a grant or concession of a tract of land two and a half miles on every side, making a square of five miles, on Trout creek, or an equivalent quantity elsewhere ; in case that situation may not allow of the said figure. In other words, the grant, quoad the location, was alternative. It was to be surveyed on Trout creek if that situation should allow of the said figure ; that is, if a sufficient quantity of vacant or public land should be found there : but if not, authority was given to take up the deficiency, " its equivalent," elsewhere.

It was apprehended at the time the grant was issued (August 2, 1816), that the requisite quantity of vacant or public land would not be found on Trout creek. This is manifest by the language of the memorial, and the decree which adopts it.

The power to change the location, as to such deficient quantity, to search for an equivalent elsewhere, was therefore given by the grant itself. It is not a new order of survey granted by the governor after the 24th of January 1818, authorizing a change of location, as in Clarke's case; but it is a contingent authority to change the location embodied in the grant given on the 2d of August 1816; at a time when the powers of the governor were not restrained by the limitations in the treaty. The total want of analogy between it and the case of the United States v. Clarke will therefore be obvious.

The governor, in this case, grants to Charles Sibbald a tract of land of five miles square, to be surveyed at the place specified in his memorial, Trout creek, if a sufficient quantity of vacant or public land should be found there; but if not, then to be surveyed elsewhere, where an equivalent quantity of vacant land could be found. It was, in other words, (so far as regards the quantity which might be deficient at Trout creek, from the want of a sufficient quantity of vacant lands there) a grant of land without a specific location; and the objection resolves itself into the inquiry, "Whether the governor had power to make such a grant on the 2d of August 1816?" If the question were now of first impression, it would seem to be free from difficulty.

The governor grants to the petitioner a certain prescribed quantity of the public domain. What part of this domain would be embraced in the grant was uncertain at the date of the concession, because of the uncertainty whether the prescribed quantity of public land could be found in the place where the petitioner desired, and the governor was willing that the grant should be laid: sed id certum est quod certum reddi potest; and the governor provided the means by which this certainty should be attained. The memorial asks for, and the decree grants, a certain quantity of land, at a particular place; and, contingently, that a part of it may be surveyed elsewhere, "together with suitable warrants for a survey" of this land, or its equivalent.

The decree allows the prayer, and directs the issue of "the appropriate certificate from the secretary's office in customary form." That certificate in customary form was the copy of the memorial and decree; and these were the warrant to the surveyor to determine the

contingency on which the authority to change the location would arise.

The power was properly delegated to the surveyor, because the contingent authority to change the location depended upon a fact, (whether there was a sufficient quantity of vacant land on Trout creek) which it was the appropriate duty of that officer to ascertain. The execution of the warrant by the survey of land, in pursuance of the authority thus given, rendered certain that (the location of the land) which was before uncertain, and thus completed the petitioner's title.

But looking to the decision heretofore made on the various cases from Florida, even this argument seems unnecessary. The treaty declares valid all grants made "by his catholic majesty, or his lawful authorities." That the governor of East Florida was one of these lawful authorities, was decided in Clark's case. The governor of East Florida, who, it is thus ascertained, was authorized to grant lands in that territory, did, in point of fact, make this grant; with this contingent authority to change the location, in due form.

And the court say in that case, "a grant made by a governor, if authorized to grant lands in his province, is prima facie evidence that his power was not exceeded. The connexion between the crown and the governor justifies the presumption that he acts according to his orders. Should he disobey them, his hopes are blasted, and he exposes himself to punishment. His orders are known to himself and those from whom they proceed, but may not be known to the world."

This was but a reiteration of the principle decided in the case of Arredondo; and the court add, "he who would controvert a grant executed by the lawful authority with all the solemnities required by law, takes upon himself the burthen of showing that the officer has transcended the powers conferred upon him, or that the transaction is tainted with fraud." The time was, when these principles were resisted with the utmost confidence; but they have now the sanction of judicial authority.

This grant by governor Coppinger, with the contingent authority to change the location, then, is prima facie evidence that he did not exceed his power in making it. But still further, it is entitled to the same consideration in this court as it would have received, "if the territories had remained under the jurisdiction of his catholic majesty," by the authorities of Spain

[United States v. Sibbald.]

We have an opportunity to know what that consideration was.

The grant was made in 1816 ; the exchange of flags took place in 1822. During the intervening time, the territories remained " under the jurisdiction of his catholic majesty."

The surveyor is entitled to the benefit of the principle which is common to all officers charged with the performance of public duties.

Under the grant of governor Coppinger, the lands were surveyed so far as vacant lands were found at the spot designated by the grant ; and, when these were exhaused, the surveyor sought, as he was required to do by the terms of the grant, an equivalent elsewhere, and returned his surveys to the proper office, as he was bound to do. The presumption that he did these things, in al. verb., that he did his duty, is the necessary result of the principle. How it corresponded with the fact, is manifest from the conduct of the Spanish authorities.

The memorialist took possession of his lands, built and rebuilt his mills ; and his title was never questioned by those authorities.

It seems wholly unnecessary to extend these remarks.

The attorney-general, for the United States, contended that there were some material words in the grant to Richard, 8 Peters 407, which are not to be found in the grant under the consideration of the court. The words are, in Richard's case, " a grant of an equivalent quantity."

This grant is also of a square of five miles ; and the plain import of the terms is, that the surveys shall not be disconnected.

The grant is made on the limited application for land at a place designated, for sixteen thousand acres. Under this grant ten thousand acres were surveyed at this place ; and afterwards two tracts one hundred miles off, one of four thousand, and one of two thousand acres. The court of Florida on this account properly refused to confirm the two last surveys.

There is another ground of objection. Sibbald had not performed the condition of the grant. It is expressly declared, that until the condition is performed it shall have no effect. The saw-mill was not constructed until three years after the grant was made. In the interval, on the 29th of October 1819, governor Coppinger had made an order limiting the execution of all such grants to six months. White's Compilations 250.

It was entirely competent for governor Coppinger to make an order

[United States v. Sibbald.]

limiting the performance of such a condition to six months; Arredondo's case, 6 Peters 691; and no title vested under the grant until the condition was executed; or, if he had, until performance, an equitable title, he was bound to comply with the condition.

If the petition of Sibbald had prayed for an equivalent in land elsewhere, in the event of his not being able to obtain the requisite quantity at one place; no objection on the ground of the severance of the surveys would be made. But the petition is for an equivalent at the place.

No permission from governor Coppinger to take the land in any other place is shown; and the act of the surveyor without such authority is of no avail.

In Clarke's case the words are, "or its equivalent." 8 Peters 440. But the court decided that the land described in the petition, and no more, was granted.

Mr Justice BALDWIN delivered the opinion of the Court.

These are cross appeals from the decree of the judge of the superior court of East Florida, on the petition of Sibbald; praying for a confirmation of his claim to sixteen thousand acres of land, pursuant to the acts of congress for adjusting land claims in Florida.

The petition was in the form prescribed by law, presenting a case proper for the exercise of the jurisdiction of the court below. On the 16th of July 1816, the petitioner applied to the governor of East Florida, setting forth that he was desirous of erecting machinery for sawing timber on Little Trout creek, on the north side of the river St. John's and that of Nassau: "he asks permission for that purpose, with the corresponding surety of the grant of land of five miles square, or its equivalent, in the event that this situation will not permit the said form; which land will insure the continued supply of timber."

On the 2d of August 1816, the governor decrees, "the permission solicited by this party is granted, without injury to third persons; under the express condition that until the establishment of the mill, the grant of the land, which will be a square of five miles, in order that he may use the timber, shall be of no effect," &c. Pursuant to this grant, a survey was made on the 2d of May 1819, of ten thousand acres, at the place called for in the grant. In February 1820, four thousand acres were surveyed in another place, called Turnbull's Swamp, at the distance of thirty miles from the first survey; and afterwards, the residue, two thousand acres, was surveyed,

at a place called Bow Legs Hammock, at the distance of twenty or thirty miles. In 1819, Sibbald commenced the erection of a saw-mill on the ten thousand acre tract, and continued it till its completion, except the dam; which would have been completed had not the negroes and horses employed been stolen: and while the mill-wright was absent in pursuit of them, the dam was carried away by a freshet. The work was then abandoned, after an expenditure of more than 5000 dollars. In September 1827, another mill was built and in operation; which was destroyed by fire in July 1828. Another was commenced in October 1828, which went into operation in June 1829, and so continues to the present time; is of seventy horse power, and calculated to saw twenty thousand feet of lumber a day.

By the decree of the court below, the claim of the petitioner was confirmed as to the ten thousand acre survey on Trout creek, and rejected as to the two remaining surveys of four thousand, and two thousand acres; from which decree both parties appealed. Various objections to the claim were made on the hearing, but only two were relied on here.

1. That the grant was on a condition precedent, which was not begun to be performed till the grant became forfeited by the order of the governor, made the 29th of October 1818, declaring all grants made in consideration of mechanical improvements to be made, to be void if the conditions were not performed in six months. It is unnecessary to decide on the effect of this order; or whether by the acts which authorize the courts of Missouri and Florida to decide on claims to lands therein, congress intended to assert a right by forfeiture for condition broken, to lands which had been once legally granted. The evidence in this and the other cases which have been decided, is very full and clear, that no grant has ever been annulled or revoked by the Spanish authorities for any cause; and that there is no instance of a governor having granted land which had been before granted on condition: and it may well be doubted, whether it would have been re-annexed to the royal domain had the province remained under the dominion of the king of Spain: nor is there any provision of any law of congress, which specially requires the court to inquire into the performance of conditions on which grants were made.

By the eighth article of the treaty of cession by Spain to the United States, the same time is allowed to the owners of land so granted, to

[United States v. Sibbald.]

fulfil the conditions of their grants after the date of the treaty, as was limited in the grants. We have heretofore decided, in the case of Arredondo, that as to individual rights, the treaty is to be considered as dated at its ratification; 6 Peters 748, 749: the erection of a mill in 1819 or 1820 would, therefore, be in time to save a forfeiture. No time was limited in the grant; and no greater effect can be given to the governor's order fixing the time for the performance of conditions, than if the limitation had been contained in the grant. We have also decided, that this provision of the treaty is not confined to owners in possession of lands by occupancy or residence, but extends to all persons who have a legal seisin and possession of land in virtue of a grant; 6 Peters 743: and that in the situation of the province and the claimants to land at the time of the cession, it was enough if they would show a performance of the condition *cy pres.* We are therefore of opinion that the petitioner began the erection of the mill in time to save the forfeiture; and that he has shown the performance of such acts as amount to a compliance with the condition, according to the rules of equity which govern these cases.

2. It is objected that the terms of the grant do not authorize a survey of any part of the sixteen thousand acres, in any other than in the place called for. The petition was for a grant of sixteen thousand acres, or its equivalent, if its situation would not admit of this form; the permission solicited was granted, which by reference makes the petition a part of the grant. It is in full proof that the quantity could not be surveyed at the place designated without interfering with land which had been previously granted; which would have been contrary to the express words of the grant, " without injury to third persons." It is also in proof, without contradiction, that in order to obtain the ten thousand acres on Trout creek, it was necessary to go round one or two different tracts, and that no more could have been obtained any where near it of any value; the shape of the survey is irregular, and not at all in conformity with the rules prescribed to surveyors; which require the surveys to be in rectangular parallelograms, the front of which on rivers, creeks and roads not to exceed one third of the depth. It was certainly the intention of the petitioner and the governor, that there should be a grant of five miles square, which was the usual quantity granted in consideration of the erection of mills : and we think that taking the petition and grant, together with the manifest intention of both parties, the equivalent for any deficiency on Trout creek may be referred to quantity

rather than to the form of the survey. It would be a very rigid con-struction of the grant, to make the privilege of altering the shape of the survey, an equivalent for the loss of six thousand acres of land. That such was not the intention of the governor is evident from the evidence of Mr Fernandez; who testifies, that on ascertaining that part of the land had been previously granted, he informed the go-vernor, who gave Sibbald the right to locate his grant at any vacant place suitable for the erection of a saw-mill. The surveyor-general of the province testified, that he filled that office in East Florida from 1811 to 1821, that he located grants by surveying any land which was designated by the grantee, to which no objection was made by any of the authorities under the Spanish government; and which was considered an inherent privilege of the grantee without any order from the government. We are therefore of opinion, that the title of the petitioner to the whole quantity of land specified in the grant is valid by the law of nations, of Spain, the United States, and the stipulations of the treaty between Spain and the United States for the cession of the Floridas to the latter; and ought to be confirmed to him; according to the several surveys made as returned with the record. We do therefore order, adjudge and decree, that the decree of the court below, confirming the title of the petitioner to the ten thousand acres on Trout creek, be, and the same is hereby affirmed. And proceeding to render such decree as the court below ought to have rendered, this court doth further order, adjudge and decree that the decree of the court below, rejecting the claim of the petitioners to the land embraced in the surveys of four thousand acres, and of two thousand acres, as returned with the record, be, and the same is hereby reversed and annulled. That the claim of the petitioner to the same be, and the same is hereby confirmed and declared valid; and that the surveyor of public lands in the eastern district of Flo-rida be, and is hereby directed to do and cause to be done, all the acts and things enjoined on him by law in relation to the lands within said surveys.


This cause came on to be heard on the transcript of the record from the superior court for the district of East Florida, and was ar-gued by counsel. On consideration whereof, it is ordered, adjudged and decreed by this court, that the decree of the said superior court confirming the title of the petitioner to the ten thousand acres on

[United States v. Sibbald.]

Trout creek be, and the same is hereby affirmed; and that the residue of the decree of the said superior court be, and the same is hereby reversed and annulled. And this court, proceeding to render such decree as the said superior court ought to have rendered, doth order, adjudge and decree, that the claim of the petitioner to the land embraced in the surveys of four thousand acres, and of two thousand acres, as returned with and contained in the record, is valid, and that the same be, and is hereby confirmed. And it is further ordered, adjudged and decreed by this court, that the surveyor of public lands in the eastern district of Florida be, and he is hereby directed to do, and cause to be done, all the acts and things enjoined on him by law in relation to the lands within said survey. And that the said cause be, and the same is hereby remanded to the said superior court to cause further to be done therein, what of right and according to law and justice, and in conformity to the opinion and decree of this court, ought to be done.

The same decree was given in the case of Sibbald, appellant v. The United States.